******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ROBERT D. BULLOCK
(AC 35006)

Beach, Keller and Prescott, Js.

*Argued September 16, 2014—officially released January 20, 2015*

(Appeal from Superior Court, judicial district of
Fairfield, Kavanewsky, J.)

*James B. Streeto*, assistant public defender, for the
appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney,
with whom, on the brief, was *John C. Smriga*, state's
attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Robert D. Bullock, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49, carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a).[1] The defendant claims that the trial court improperly (1) declined to deliver a jury instruction pertaining to the fallibility of eyewitness identification evidence, (2) permitted the state to introduce prior misconduct evidence and denied his motion for a mistrial related to such evidence, (3) permitted the prosecutor to question him concerning a certain statement that he allegedly made, and (4) instructed the jury with regard to the element of intent. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. At or about 5 p.m., on September 24, 2010, Sergeant Greg Granello of the Bridgeport Police Department was operating a marked police cruiser in the vicinity of the Stratford Avenue Bridge in Bridgeport. At that time, he observed and decided to stop two males, the defendant and Daquan Long, as part of his investigation of a shooting that occurred nearby a short time earlier. Granello advised the police dispatcher of his whereabouts and his intent to stop these two men.

Granello observed the defendant, who was wearing a red shirt, and Long, who was wearing all black clothing, riding on bicycles across the bridge. He parked his police cruiser in such a manner as to block their travel off the bridge, got out of his cruiser, and ordered the defendant and Long, who were positioned behind his police cruiser, to stop and show their hands. Bridgeport police Officers Jason Ferri and Mark Blackwell also were present at this time. Ferri and Blackwell parked their police cruisers behind that of Granello. The defendant and Long disregarded Granello's repeated commands as they stood on the bridge while straddling their bicycles and facing Granello. The defendant, who may have been as close as fifteen feet from Granello, raised a black handgun and fired several shots at Granello.[2] Granello took cover near the front of his cruiser on the driver's side before he returned gunfire in the defendant's direction. Long, who was standing in close proximity to the defendant, brandished a black and silver handgun and fired several shots at Ferri. Ferri returned fire and took cover briefly. The hood and front windshield of Granello's police cruiser sustained bullet damage, likely caused when Granello fired upon the defendant. The rear license plate and rear window sustained damage from bullets that were fired from behind the vehicle.

After the brief exchange of gunfire came to an end, the police officers at the scene observed the defendant and Long lying in opposite directions near one another on the sidewalk portion of the bridge, where they initially had been stopped by Granello. Both men had discarded their handguns, which were later recovered by the police, into the Pequonnock River, which flows under the bridge. The defendant and Long were handcuffed and taken into police custody.

In connection with the events that had transpired on the bridge, the defendant was arrested, tried, and convicted of attempt to commit assault in the first degree, carrying a pistol without a permit and reckless endangerment in the first degree. The present appeal followed. Additional facts will be discussed as they become relevant to our analysis of the claims raised in this appeal.

I

First, the defendant claims that the court improperly declined to deliver a jury instruction pertaining to the fallibility of eyewitness identification evidence. We disagree.

The state presented the testimony of four witnesses who observed the defendant's conduct on the bridge at the time of the shooting: Granello, Ferri, Blackwell and Christine Vitka. We begin our review of the defendant's claim of instructional error with a review of the relevant aspects of the testimony of these witnesses. Granello testified in relevant part that he observed two black males as they attempted to cross the bridge on their bicycles. He stated that he continued to observe the two individuals after he exited his police cruiser and continued to observe them when he ordered them to stop and show their hands. He testified that they did not comply, and that the individual who was closer to him and wearing a red shirt reached behind his back, brandished a handgun, and fired the gun in his direction. Granello testified that he observed the handgun before he dove to the ground and returned fire. He stated that he fired at the shooter wearing the red shirt until such time as the shooter dropped to the ground behind a small concrete barrier on the bridge. Granello then positioned himself where he could observe both individuals and found that they were lying down in a prone position on the sidewalk. Granello described the other individual who was with the shooter in the red shirt as being dressed in "all black . . . ." During his testimony, Granello stated that he could identify the person who was wearing the red shirt and who fired in his direction on the bridge. Then, Granello identified the defendant as the shooter.

Granello testified that both individuals were approximately the same size and that they were standing close to each other during the shooting. Also, he stated that

the difference in the clothing worn by the individuals, with one individual wearing all black clothing and the other individual wearing a red shirt, was an important distinction. Although, prior to the shooting, Granello observed the defendant's torso, he stated that he was looking intently at the defendant's hands and for other gestures that could indicate danger. Granello testified that he observed the firearm used by the defendant "[a]lmost head on" and that he saw it discharge twice before he took cover. At the time of the shooting, Granello was approximately twenty-five to thirty-five feet from the defendant. Granello testified that, at that time, he was focused on the defendant and that he did not know whether the other individual on the bridge fired at him. He testified that after he took cover, he "lost all sight" for a couple of seconds while he heard the sound of gunfire. Granello testified that, after he took cover, he managed once again to observe the defendant, who was still standing in the same position. Granello then returned fire, discharging between five to seven gunshots. Granello testified that the exchange of gunfire lasted for less than one minute and that, within fifteen seconds after the last shot was fired, he approached the individuals who were then lying face down on the sidewalk. When asked to describe the shooting event, Granello testified that it possibly could be described as a frantic event, but that it was not chaotic.

During his cross-examination, Granello testified that after the incident on September 24, 2010, until the date of his testimony, he had not observed the defendant. Also, Granello testified that he was never asked to identify the defendant in a photographic array. The following colloquy between the defendant's attorney and Granello then occurred:

"Q. So, you . . . were never shown the photo array by any members of the detective bureau or any superior officers in an effort to determine who had shot at you on the bridge?

"A. No.

"Q. The entire basis for you saying who had shot at you on the bridge is by linking it to the red shirt, is that correct?

"A. Yes; on scene, yeah.

"Q. Right, because you didn't recognize the face of the person in the red shirt, did you?

"A. Recognize when?

"Q. At the scene at that moment when the events occurred, you did not recognize the face of the person in the red shirt, did you?

"A. I saw, I don't remember it.

"Q. Right. You . . . saw it, but it was a face you had not seen before, correct?

"A. Correct. . . .

"Q. How is it then, officer, that nearly two years after the events you're able to say that the young man who shot on the bridge is this young man right here?

"A. I knew the name of the individual.

"Q. But did you know the name on September 24th?

"A. After the fact; yes.

"Q. After the fact?

"A. Yes.

"Q. Somebody in the police department gave you the name of the person in the red shirt?

"A. Yes. . . . I pointed him out, let everyone know that's the individual who shot at me, and they identified him for me, gave me his name.

"Q. And so by way of the fact that you've been called as a witness in this case and you know this case is the state of Connecticut versus Robert Bullock, you therefore conclude that the person who shot at you must be the person at counsel table?

"A. Yes.

"Q. Has nothing to do with the face of the man, does it?

"A. No."

Thereafter, Granello testified that he was taken to a hospital from the shooting scene, at which time he was suffering from stress and anxiety. He testified that he felt like his heart was racing, he felt light-headed and he felt slightly dizzy. He testified that he did not experience confusion following the shooting and that at no time following the shooting did he experience any memory loss concerning the events that occurred at the scene of the shooting. Granello testified that he had not been involved in a shooting incident prior to the events of September 24, 2010. On redirect examination, Granello testified that he was positive that the man lying on the ground wearing the red shirt was the man who shot at him.

In relevant part, Ferri testified that, prior to the time that the shooting took place, he and Granello were attempting to stop two individuals who were traveling near one another on bicycles across the bridge. He stated that he parked his police cruiser behind that of Granello, and that he and Granello exited their police cruisers. Ferri heard Granello order the individuals to stop and show him their hands, but they did not comply. While Ferri was approaching Granello on foot, the individual wearing a red shirt began shooting at Granello and the individual wearing a black sweatshirt began firing at Ferri. Momentarily, Ferri took cover before returning fire at the shooter dressed in all black. Ferri

testified that, during the shooting, the shooters were standing perhaps six or eight feet apart. After the shooting ended, Ferri observed both shooters lying side by side on the bridge. He stated that he was present when both of the shooters were taken into police custody and that he was "[a]bsolutely" positive that the person wearing the red shirt had been shooting at Granello.

Ferri testified that he had been involved in a police shooting a short time prior to the events of September 24, 2010. Also, Ferri testified that after the events of September 24, 2010, he experienced a high level of anxiety, shortness of breath, rapid heartbeats and confusion. Ferri testified, however, that he had not experienced memory loss and that he remembered the shooting event daily. When asked by defense counsel if he needed "some time in order to get the events clear in [his] head before [he] wrote [his] report," Ferri replied in the negative. Ferri testified that as a result of stress and physical injuries caused by the events that transpired on the bridge, he "took administrative leave."

During his testimony, Ferri referred to the person wearing the red shirt at the time of the shooting as "Mr. Bullock." He stated that he did not know the defendant's name at the time of the events that transpired on the bridge, but that he learned it after the shooting incident. When Ferri was shown a photograph of the defendant at trial, he testified that he recognized the individual depicted in the photograph as the person who was on the bridge and, later, taken into custody in his presence.

In relevant part, Blackwell testified that, as a result of police communications on September 24, 2010, he traveled in his police cruiser to the bridge where the shooting occurred. From a vantage point of approximately twenty-five feet away, from inside his police cruiser, he observed Granello, who was getting out of his police cruiser, and a person who was standing on the sidewalk and wearing a red shirt. Blackwell estimated that, prior to shots being fired, Granello was approximately fifteen feet away from the person who was wearing the red shirt. Blackwell stated that "[a]t that point, the male—the party with the red shirt; I saw his arm extended, then I heard two shots. I saw Sergeant Granello drop to the ground, he removed his firearm. I saw him go back toward the left side of his car. I heard multiple shots being fired." Blackwell stated that he notified the police dispatcher that shots had been fired and that an officer needed assistance. Blackwell then exited his police cruiser, approached Granello and walked to the sidewalk portion of the bridge. There he observed two males, one who was wearing a black shirt and another who was wearing a red shirt, lying on the sidewalk. Blackwell stated that he had seen the person who was wearing the red shirt on two prior occasions and that he knew him to be "Robert Bullock." Also, Blackwell testified that he knew the defendant's street

name. Blackwell identified the person who was wearing a red shirt as the defendant, who was present in the courtroom. Blackwell testified that he handcuffed the defendant and took him into police custody.

During his cross-examination, Blackwell agreed with the characterization of the defendant's attorney that the scene of the shooting was "a pretty frantic chaotic scene . . . ." Blackwell disagreed, however, with the suggestion that at the time of the shooting his ability to observe relevant events had been impeded by the sun, Granello, or Granello's police cruiser. Blackwell testified that although he was unable to determine whether the person who was wearing a red shirt was, during these events, on a bicycle or straddling a bicycle, he observed him extend his arm. Blackwell stated that he did not observe a firearm or flashes of light consistent with the discharge of a firearm. Blackwell testified that he did not have any doubt as to the identity of the person who had been wearing a red shirt, had extended his arm, and had shot a gun toward Granello on the bridge, and that this person was the defendant, who was seated in the courtroom.

Additionally, the state presented testimony from Vitka, a bystander who was driving across the bridge on her way home from work on September 24, 2010. Vitka testified that when she drove onto the bridge that day, she saw a man who was wearing a red shirt shooting in the direction of a police cruiser. Vitka stated that she also observed a police officer returning fire. As a result of the shooting, Vitka lay across the seat of her automobile until after the shooting stopped. Vitka testified that the shooting took place all around her, but she was a considerable distance from the person who was wearing a red shirt. She stated that she believed that this person was shooting a gun because of the way that his arms were extended and because of the sound of gunshots, but she did not see flames or smoke come out of a gun in his possession. Vitka testified, as well, that after the shooting, she was transported to the police department by her brother, who was a Bridgeport police officer.

The defendant testified that just prior to the shooting, he and Long were crossing the bridge on their bicycles. He testified that he was wearing a red shirt and that Long was dressed in black clothing. The defendant testified that a police officer approached, parked his police cruiser, exited the cruiser with his gun drawn, and ordered him to put his hands up. The defendant stated that as he was complying with this order, he heard gunshots and dropped to the ground. The defendant testified that once the shooting stopped, police officers kicked him before transporting him to the police department. The defendant testified that he was unarmed at the time of the shooting.

A theory of defense, as reflected in the defendant's

testimony, defense questioning of the eyewitnesses to the shooting, and defense argument to the jury, was that the defendant, though present at the scene of the shooting, was unarmed at that time and that eyewitnesses at the scene mistakenly identified him as a shooter. At trial, the defendant, however, did not attempt to present expert testimony on the fallibility of eyewitness identification testimony. Prior to the presentation of evidence, the defendant filed a lengthy written request to charge that included a requested instruction concerning the jury's role in evaluating the testimony of eyewitnesses to the shooting.[3]

During a charging conference that was held after the presentation of evidence, the state objected to the defendant's proposed eyewitness instruction. The state argued that the request was not appropriate because it pertained to identifications made with the use of photographic arrays or other out-of-court identification procedures. Here, the state argued, no such subsequent identifications were at issue because the witnesses identified the defendant at the time of the crime and at the scene of the crime, at which time he was arrested and taken into police custody.

The court agreed with the state, stating: "I don't think this is a case that requires or even warrants the giving of an eyewitness identification instruction to the jury. Certainly, the jury is going to be made aware that the state must prove that the defendant was . . . the perpetrator of the crime or any crime. But I agree with the state that the eyewitness identification instructions which you're asking me to give relate to matters that are simply not present in these circumstances, and that is . . . some of the things the state has just pointed out by way of a subsequent out-of-court identification among other things. Not exclusively, but among other things, okay." The defendant's attorney took an exception to the court's ruling.

The court instructed the jury that the state bore the burden of proving beyond a reasonable doubt that the defendant committed the offenses with which he was charged. The court also provided the jury with instructions related to assessing the credibility and accuracy of testimony generally. These instructions made clear that the jury, as the sole arbiter of credibility, was carefully to scrutinize the testimony of each witness and to determine whether to accept such testimony in whole, in part, or at all.[4] Additionally, the court instructed the jury: "The testimony of a police officer is not entitled to any special credibility simply because it comes from a police officer. You should not automatically believe or disbelieve them merely because they're police officers. A police officer who takes the witness stand subjects his testimony to the same tests that any other witness does. You should recall their demeanor here on the witness stand, the training, if any, in the field in

which they gave evidence, the manner of their testimony, the substance of their testimony and their capacity for observing facts and relating them to you reliably and accurately. So, you should weigh their testimony just as you would that of any other witness."

After the court delivered its charge, the defendant's attorney renewed his objection to the court's decision not to deliver the defendant's requested instruction concerning eyewitness identification testimony. In relevant part, the defendant's attorney stated: "Now, we can see that this is not a case driven by photo arrays and lineups subsequent to the alleged event, but this is still a case that rises and falls on what motorists and police officers at the scene observed as the crime unfolded. This is absolutely a case where witnesses have come in and testified about eyewitness identifications." Also, the defendant's attorney asserted that the court should have given an identity instruction, as had been set forth in the defendant's written request to charge. Following a brief recess, the court delivered a supplemental jury instruction addressing identity and identification evidence.[5]

As the foregoing recitation of procedural history reflects, the defendant preserved the claim of instructional error for appellate review by means of his written request to charge or, alternatively, his exception to the court's charge. See Practice Book § 42-16. As with any claim of instructional error, we must begin our analysis by setting forth the appropriate standard of review. The defendant states that the claim is constitutional in nature and, accordingly, we must consider whether it was reasonably possible that the court's instructional omission misled the jury. In this regard, the defendant, citing *State* v. *Clark*, 264 Conn. 723, 729, 826 A.2d 128 (2003), likens the alleged instructional error to "[a]n improper instruction on a defense in a criminal case."

Unlike *Clark*, which concerned an instruction pursuant to General Statutes § 53a-19, the present case does not concern an instruction related to an established criminal defense. There is no support for the proposition that a claim related to the failure to deliver a requested instruction related to eyewitness identification evidence is of constitutional magnitude. Our Supreme Court has held that identification instructions are not constitutionally required[6] and " '[e]ven if [a] court's instructions were less informative on the risks of misidentification than they might have been, the issue is at most one of instructional error rather than constitutional error. A new trial would only be warranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled.' " *State* v. *Cerilli*, 222 Conn. 556, 567, 610 A.2d 1130 (1992), quoting *State* v. *Tillman*, 220 Conn. 487, 501, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992). "The ultimate test of a court's

instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Tatum*, 219 Conn. 721, 734, 595 A.2d 322 (1991); *State* v. *McKnight*, 191 Conn. 564, 583, 469 A.2d 397 (1983).

"While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is . . . reasonably probable for nonconstitutional [improprieties] that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 455, 10 A.3d 942 (2011).

The defendant argues that the only evidence that he was a shooter came in the form of eyewitness testimony from Granello, Ferri, Blackwell and Vitka. He argues that "[a]ll four eyewitnesses were affected in some degree by stress, fear, expectation, weapon focus, and distance." Relying almost exclusively on *State* v. *Guilbert*, 306 Conn. 218, 225–67, 49 A.3d 705 (2012), he argues that the court improperly denied his request to charge that covered these scientifically established psychological and physical factors that, with respect to eyewitness identification, affect perception and memory. He asserts that the court improperly refused "to instruct the jury on how to assess the factors elicited in cross-examination of the most important state's witnesses on the most important point in the case, whether their observations were accurate." According to the defendant, "[h]ad the trial court provided the jury with instructions which advised them of the weak correlation between certainty and accuracy, the single most powerful determinant in jurors' assessment of accuracy would have been reduced. Had the jury known to apply the proper factors in its assessment, [he] would have been entirely acquitted."[7]

Relevant to the present appeal, the issue before our Supreme Court in *Guilbert* was whether a trial court improperly precluded a defendant from presenting expert testimony on the fallibility of eyewitness identification testimony. *State* v. *Guilbert*, supra, 306 Conn. 220. The defendant in *Guilbert* was convicted of one count of capital felony, two counts of murder and one count of assault in the first degree as a result of his

involvement in two shooting incidents that resulted in the deaths of two victims and the life-threatening injuries to another victim. Id., 220–22. The evidence demonstrated that eyewitnesses to the relevant events, including one of the victims, had identified the defendant as the perpetrator following the events at issue. Id., 223–24. Within hours of the shootings, the victim identified the defendant by means of several photographic arrays. Id., 223. Between nine and ten days after the shootings, two other eyewitnesses identified the defendant to the police after they saw his photograph in a newspaper. Id., 223–24. Yet another eyewitness, who had lived with the defendant for a long period of time, identified the defendant nine days after the shootings. Id., 224.

Prior to trial, the defendant in *Guilbert* indicated that he intended to call a witness as an expert on eyewitness identifications. Id., 226. The state filed a motion to preclude such evidence on the ground that the reliability of eyewitness identifications is a matter within the knowledge of the average juror. Id. Following an evidentiary hearing, the court precluded the evidence. Id., 228.

On appeal, our Supreme Court in *Guilbert* held that the trial court improperly had granted the state's motion to preclude, but that, in light of the court's jury instructions concerning eyewitness identification, the error was harmless. Id., 265–67. In reaching its holding, the court expressly overruled earlier precedent that stood for the proposition that expert testimony on the fallibility of eyewitness identification testimony was disfavored because it invaded the jury's province to determine what weight, if any, to afford such eyewitness testimony. Id., 226. This precedent included *State* v. *Kemp*, 199 Conn. 473, 475, 507 A.2d 1387 (1986) (eyewitness identification of defendant occurred by means of police photoboards and photographic displays), and *State* v. *McClendon*, 248 Conn. 572, 577, 730 A.2d 1107 (1999) (eyewitness identification of defendant made two years following crime by means of police lineup including voice sample by defendant). Contrary to the rationale set forth in *Kemp* and *McClendon*, the court in *Guilbert* held "that expert testimony on eyewitness identification is admissible upon a determination by the trial court that the expert is qualified and the proffered testimony is relevant and will aid the jury." *State* v. *Guilbert*, supra, 306 Conn. 226. The court reasoned that there was "widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror. This broad based judicial recognition tracks a near perfect scientific consensus." (Footnote omitted.) Id., 234–35. Accordingly, the court determined that an expert should be permitted to testify about relevant factors[8] that affect the reliability of eyewitness identification evidence. Id., 248.

Although the defendant in *Guilbert* raised an evidentiary claim, and not a claim of instructional error, the court provided guidance about the proper composition of jury instructions related to the fallibility of eyewitness identification evidence. The court stated: "We also wish to reiterate that a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions on the fallibility of eyewitness identification evidence . . . would alone be adequate to aid the jury in evaluating the eyewitness identification at issue. We emphasize, however, that any such instructions should reflect the findings and conclusions of the relevant scientific literature pertaining to the particular variable or variables at issue in the case; broad, generalized instructions on eyewitness identifications . . . do not suffice." (Citations omitted; footnote omitted.) Id., 257–58. The court stated: "[T]he proper approach . . . is to leave the development of any such jury instructions to the sound discretion of our trial courts on a case-by-case basis, subject to appellate review." Id., 248 n.27.

In its new approach to the admissibility of expert testimony concerning the fallibility of eyewitness identification evidence and in its discussion of jury instructions related to such evidence, our Supreme Court in *Guilbert* undeniably sought to protect defendants from a specific risk, that of being misidentified as perpetrators by eyewitnesses to criminal activity. Because that risk of misidentification is not implicated by the facts of the present case, the defendant's reliance on *Guilbert* and his arguments in the present case are misplaced.

*Guilbert*'s safeguards are meant to ensure that a jury will have necessary information by which to evaluate eyewitness identification evidence, information that will effectively educate the jury that, for a variety of scientifically valid reasons, such identifications are potentially unreliable. In the present case, the defendant was afforded an ample opportunity to elicit, and did elicit, facts from the eyewitnesses to the crime that tended to undermine the reliability of their testimony. The undisputed facts in the present case, which are supported both by the state's case as well as that of the defendant, are that Granello approached the defendant while he was crossing a bridge with Long. No other individuals were near them on the bridge. After Granello issued commands to these two individuals, gunfire erupted for a very brief period of time. Seconds later, Granello, Ferri, and Blackwell walked to the location on the bridge where the defendant and Long were lying on the ground. At that time, just moments after the gunfire ceased, the defendant was taken into police custody. It is undisputed that, at all times relevant both prior to, during, and following the shooting, the defendant was wearing a red shirt and Long was dressed in black clothing. Granello, Ferri, Blackwell, and Vitka

identified the defendant by means of his clothing, namely, his red shirt. Moreover, as a result of prior experience, Blackwell knew the defendant by name.

On these facts, the risk of the type of *misidentification* at issue in *Guilbert* is nearly nonexistent. The method by which the defendant was identified as a suspect in the present case is clearly distinguishable from the type of identification procedures that were at issue in *Guilbert, Kemp,* and *McClendon.* The eyewitnesses in the present case did not identify the defendant days, weeks, or months following the events at issue. They did not identify the defendant by means of an identification procedure, such as a photographic array or a show-up identification. Neither the eyewitnesses nor the defendant had left the scene before the defendant was taken into custody; the defendant was taken into police custody at the crime scene just moments after the shooting ended. The defendant was not identified as a suspect and, thereafter, taken into police custody as a result of any identification procedure, but because he was effectively apprehended by the police during his commission of the crime. It was what police observed, the defendant's clothing, and his physical presence on the bridge at the time of the shooting that led to his arrest. Although the defendant argues that the type of instruction that he sought would have helped the jury in evaluating the witnesses' *observations* as to what transpired on the bridge generally, *Guilbert* does not address the fallibility of witness' observations, but the fallibility of eyewitness' *identifications.*

Moreover, even a cursory review of the defendant's requested instruction reveals that it covered topics, such as postincident identification procedures, that were immaterial to the evidence presented in this case. See footnote 3 of this opinion. The totality of the circumstances unique to the present case, in which the defendant's identification was unrelated to facial recognition, lead us to conclude that the enhanced or focused jury instructions sought by the defendant were not necessary. Accordingly, we conclude that it is not probable that the court's instructions, which guided the jury to carefully scrutinize the testimony of the eyewitnesses to the shooting, misled the jury.

## II

Next, the defendant claims that the court improperly permitted the state to introduce prior misconduct evidence and denied his motion for a mistrial related to such evidence. We disagree.

The following additional facts and procedural history are relevant to this claim. During his testimony, Ferri stated that, just prior to the shooting at issue in the present case, he was involved in an investigation in the vicinity of Iranistan Avenue and Wood Avenue in Bridgeport. He stated that he had been continuing his

investigation at the location of the Stratford Avenue Bridge, where the shooting at issue in the present case occurred. The defendant's attorney offered a "standing objection" on the grounds of relevancy and materiality to the line of questioning that elicited this testimony. In support of his objection, the defendant's attorney stated that the defense did not challenge "the basis" for the police conduct in stopping the defendant and Long. The court overruled the objection.

The following day, the defendant's attorney drew the court's attention to a motion in limine, filed by the defense, to prohibit the state from presenting any evidence related to the incident which preceded the shooting on the bridge. Specifically, the defendant's motion, referring to a disclosure made by the state, stated that a shooting took place on Iranistan Avenue in Bridgeport just twenty minutes prior to the shooting on the bridge, Long was the suspected shooter, and the defendant was present at that shooting.[9] The defendant's attorney stated that the police had not charged the defendant with any criminal offense in connection with that earlier shooting and that the defendant denied any involvement in it. The motion stated, inter alia, that the evidence at issue was irrelevant and unduly prejudicial. The defendant's attorney argued that the court should preclude any further reference to the police investigation of an incident that occurred prior to the shooting and that the court should instruct the jury that it should not consider any evidence that related to the prior incident.

The court stated that the testimony up to that point in the trial, from Granello and Ferri, merely suggested that the police had stopped the defendant and Long on the bridge as part of their investigation into another matter in the area of Iranistan Avenue in Bridgeport. The court stated: "[C]ertainly, the jury can . . . conclude from [that testimony] that there was some ongoing investigation that caused the police to position themselves on the bridge, and I don't think that's inappropriate. I think that's highly appropriate, and it's certainly not prejudicial. I think to further sanitize it would . . . distort the context of why [the police] were there and leave the jury to scratch their heads, you know, what's going on here, so to speak. I think some explanation is necessary . . . ." Furthermore, the court stated that part of the challenged testimony had been elicited during the cross-examination of Granello and Ferri when they were asked questions about the manner in which they approached the defendant and Long on the bridge and, specifically, why they did not have their guns drawn at that time.[10] The court stated that the state had not elicited any unduly prejudicial testimony, and that the court would consider the admissibility of any additional testimony as well as the need for limiting instructions, if necessary.

Later during the trial, on May 24, 2012, the defendant

moved for a mistrial on the ground that the testimony up until that time, which included references to an investigation at the time of the shooting, was prejudicial in that it possibly suggested that the defendant had been involved in a criminal incident, thereby making it more likely that he possessed a gun on the bridge. The prosecutor responded that, insofar as it concerned the police investigation that caused the police to stop the defendant and Long on the bridge, the testimony did not suggest that the defendant was a suspect in any wrongdoing, but merely that the police stopped the defendant for a particular reason. The prosecutor indicated that he had been careful to avoid eliciting any details concerning the prior incident under investigation by the police. The court denied the motion for a mistrial on the ground that the defendant was unable to demonstrate that the testimony at issue had caused any prejudice to his defense.

The next day, the defendant testified in relevant part during his direct examination that at approximately 5 p.m. on the day of the shooting, he and Long were riding on bicycles together and traveling across the bridge at which time they encountered the police. The defendant testified that he was unarmed during the events in question. During the state's cross-examination of the defendant, the court permitted the prosecutor to ask the defendant about his initial interaction with Long on the day of the shooting. Among other inquiries, the prosecutor asked the defendant if, prior to traveling to the bridge, he was "in the area of Iranistan Avenue and Wood Avenue" with Long, and whether he saw Long "shoot an individual over in that location . . . ." The defendant replied in the negative, stating that he had met Long that day at a YMCA, and that he had not discussed an earlier shooting with Long. In permitting this area of inquiry over the defendant's objection, the court observed that it intended to permit the state to present evidence for the purpose of rebutting certain evidence presented by the defendant, specifically, that Long's clothing tested positive for gunshot residue and that he, therefore, had been the only person on the bridge who discharged a firearm at the police.

The defense presented such gunshot residue evidence from Fung Kwok, a physician employed by the state forensic science laboratory. Kwok testified that gunshot residue particles, which contain the elements lead, barium, and antimony, form when a gun is fired. This gunshot residue can land on a shooter's clothing, his or her hands, or on nearby surfaces. Kwok testified that he examined a black short-sleeved shirt and a black long-sleeved hoodie, both of which were shown to have been worn by Long at the time of the shooting. Kwok testified that particles containing some of these elements were detected on the front of the shirt, and that particles containing all of these elements were detected on the sleeves of the hoodie. With regard to the short-

sleeved red shirt that was shown to have been worn by the defendant at the time of the shooting, Kwok testified that the front of the red shirt tested positive for one particle of lead and, thus, it did not test positive for gunshot residue.

The court explained that, in light of this evidence, the state would be permitted to present evidence that, prior to the shooting on the bridge, "Long was at Iranistan and Wood firing a weapon . . . [and] that this defendant . . . was in the vicinity, but he was not observed to be . . . shooting or armed."[11] The court stated that in light of the gunshot residue evidence and the state's anticipated rebuttal inquiries, it would not be unduly prejudicial for the state to ask the defendant about events that took place involving himself and Long just prior to the shooting on the bridge. The court viewed such testimony, related to the relationship between the defendant and Long as well as their activities prior to the shooting, as relevant to and probative of the issues in the case, and stated that it would deliver some type of limiting instruction concerning the evidence.

Later in the trial, on May 29, 2012, the defendant's attorney renewed his objection to the admission of any additional evidence by the state related to a prior shooting incident on September 24, 2010. Following lengthy arguments concerning this issue, the court concluded that the evidence concerning the earlier shooting was admissible primarily to rebut the defense argument, based on the evidence, that Long's clothing tested positive for gunshot residue because he was the only shooter during the incident on the bridge. Also, the court stated that the evidence was relevant to corroborate the state's theory that there were two guns and two shooters on the bridge, which was supported by the evidence that two guns were recovered from the Pequonnock River following the shooting.

As was set forth previously in this opinion, Ferri's testimony provided a basis on which the jury could find that during the shooting on the bridge the defendant had brandished a black gun and that Long had brandished a black and silver gun. Additionally, Christopher LaMaine, a lieutenant with the Bridgeport Police Department, testified that the police conducted an underwater search in the Pequonnock River following the shooting. On September 24, 2010, police divers recovered a black .380 caliber Baikal semiautomatic gun, which was partially loaded, from the river. This gun was located approximately ten feet from the South side of the bridge, and it did not exhibit any rust or decay, and it appeared to LaMaine that it had been submerged for a short period of time. On September 27, 2010, police divers recovered a .40 caliber Springfield Armory pistol approximately ten feet from the bridge and ten feet from the location at which the police had

discovered the first gun.

During the state's case-in-chief, Joette Devan, a detective with the Bridgeport Police Department, testified that during her examination of the crime scene on the bridge, she collected three .380 caliber shell casings from the sidewalk portion of the bridge. The state presented testimony from Marshall Robinson, a firearms examiner employed by the state police forensic laboratory and the Bridgeport Police Department, who testified on the basis of his examination of these .380 caliber shell casings and the Baikal .380 semiautomatic pistol, the weapon that the police divers first had recovered from the Pequonnock River, that the shell casings had been fired from that pistol, which functioned normally.

During the state's rebuttal case, the state presented the testimony of Juan Villafane, a Bridgeport police officer. In relevant part, Villafane testified that, on September 24, 2010, he responded to the vicinity of Iranistan Avenue and Wood Avenue after the police learned of a reported shooting at that location, at which time he observed an injured person who appeared to have been shot, as well as shell casings. The state also presented testimony from Deputy Chief James Baraja of the Bridgeport Police Department, who testified that he responded to this crime scene, observed a gunshot victim, and guarded six shell casings found at the scene, until such time as they had been collected by another police officer. He stated that, while he was on the scene, the police received information that an officer needed assistance at the Stratford Avenue Bridge and that he sent officers to that scene.[12] Robinson, the state's ballistics expert, testified during the state's rebuttal case that he performed a forensic examination of the six .40 caliber Smith and Wesson cartridge casings that Baraja discussed during his testimony and that he concluded that the shell casings had been fired from the .40 caliber Springfield Armory pistol, the second gun that the police divers had recovered from the river.

Immediately after the state concluded its rebuttal case, the court, at the request of the defense, delivered an instruction that limited the jury's consideration of the evidence concerning the prior shooting incident on September 24, 2010. Among other things, this instruction related to evidence that shell casings found at the scene of the prior shooting came from a gun that was recovered from the Pequonnock River. The court stated that the jury was not to consider any evidence related to the prior shooting as proof that the defendant was involved in the prior shooting or of his character, but merely for the purpose of evaluating evidence of gunshot residue on Long's clothing and a gun found in the Pequonnock River.[13] During its charge, the court reiterated an instruction of a similar nature, emphasizing that the evidence was relevant to an assessment of the gunshot residue evidence as well as an evaluation

of the actions of the police on the bridge, but not as proof that the defendant was involved in the prior shooting or of his character.[14] The defendant did not object to either instruction.

As it pertains to the evidence related to the earlier shooting that occurred on September 24, 2010, the defendant raises two distinct claims. First, he claims that the court improperly denied his motion for a mistrial on May 24, 2012. Second, he raises an evidentiary claim in which he asserts that the court improperly permitted the state to present prior misconduct evidence related to the earlier shooting. We will address each claim, in turn.

A

The defendant does not devote a significant portion of his argument to the court's denial of his motion for a mistrial. In support of this claim, he appears to rely on his arguments that any evidence related to the prior shooting was improperly admitted and unduly prejudicial.

As the defendant correctly observes, on May 24, 2012, the time that he moved for a mistrial and the court ruled on the motion, the court merely had permitted the state to present evidence that the police stopped him on the bridge in the course of their investigation of some type of incident—the state had not yet presented any evidence of a detailed nature that a prior shooting had occurred earlier that day. The defendant's attorney argued that even such generic references to a police investigation were prejudicial in that they suggested wrongdoing on the part of the defendant, but the court rejected this rationale. In considering the court's ruling, we, of course, look to the facts and arguments before the court at the time that it made its ruling. See *State* v. *Harris*, 32 Conn. App. 476, 481 n.4, 629 A.2d 1166 ("[w]e are bound to evaluate the propriety of the trial court's rulings on the basis of the facts known to the court at the time of its rulings"), cert. denied, 227 Conn. 928, 632 A.2d 706 (1993).

"Although the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . .

"[T]he principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is

addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In [its] review of the denial of a motion for [a] mistrial, [our Supreme Court has] recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Reilly*, 141 Conn. App. 562, 568, 61 A.3d 598 (2013).

At the time that the court made its ruling, which was before it had admitted a significant amount of evidence related to the prior shooting, the state had presented evidence from which the jury reasonably could infer that the police had some legitimate interest in stopping the defendant and Long on the Stratford Avenue Bridge. The evidence did not necessarily suggest that the defendant had engaged in any type of wrongdoing prior to the stop. Like the trial court, we conclude that the evidence was not in any way prejudicial to the defendant. Furthermore, even if it could properly be viewed as being unduly prejudicial to the defense, any danger inherent in its admission would have been cured by the court's limiting instructions, which were tailored to cure such prejudice. "It is axiomatic that a jury is presumed to have followed a court's limiting instructions. . . . [I]nstructions limiting the use of the . . . evidence [serve] to minimize any prejudicial effect that it otherwise may have . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Kantorowski*, 144 Conn. App. 477, 492, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013).

Although this claim is limited to the evidence that the court had admitted at the time that the court denied the motion for a mistrial, we reject in part II B of this opinion the defendant's claim that the court improperly admitted *any* evidence related to the prior shooting. In our analysis of the present claim, we are mindful of our analysis of relevance and prejudice in that portion of our opinion, for the defendant is unable to demonstrate that the court's proper admission of evidence necessitates a mistrial. On these facts, the defendant has not demonstrated that the court's denial of a motion for a mistrial constituted an abuse of discretion.

B

Next, we address the defendant's evidentiary claim. The defendant argues that the court abused its discretion in admitting the evidence related to the earlier shooting because (1) it was not admissible as prior misconduct evidence and (2) it was more prejudicial than probative. "[O]ur standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the

defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Hart*, 118 Conn. App. 763, 786, 986 A.2d 1058, cert. denied, 295 Conn. 908, 989 A.2d 604 (2010).

1

As an initial matter, we disagree with the defendant that the evidence at issue falls within the category of prior misconduct evidence. The state did not offer the evidence as prior misconduct evidence, and the court did not admit it on that ground.

Section 4-5 of the Connecticut Code of Evidence provides: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(c) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

A reasonable interpretation of the evidence at issue does not suggest that it was presented to demonstrate that the defendant had engaged in any type of crime, wrong or act in connection with the prior shooting. Moreover, the court, by way of its limiting instructions both during the trial and during its charge, unambiguously instructed the jury that it was not to consider the evidence at issue as proof that the defendant had engaged in any wrongdoing or that he had bad character or propensities. We observe, additionally, that the state, during closing argument, did not make any suggestion to the contrary. Under these circumstances, we conclude that this aspect of the defendant's claim is without merit.

2

We next address the defendant's argument that any evidence related to the prior shooting was more prejudicial than probative. In the defendant's brief, this argument is intertwined with his argument that the evidence

should not have been admitted as prior misconduct. Although we have rejected the defendant's characterization of the claim as one involving the admission of prior misconduct evidence, we recognize that, on several occasions during the course of the trial, the defendant had objected to the admission of any evidence related to the earlier shooting on the grounds of relevance and prejudice. Therefore, it is appropriate that we address separately this aspect of the claim.

"[R]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 275–76, 96 A.3d 1199 (2014); see also Conn. Code Evid. § 4-1. "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." Conn. Code Evid. § 4-3. "All evidence adverse to a party is, to some degree prejudicial. To be excluded, the evidence must create prejudice that is undue and so great as to threaten injustice if the evidence were to be admitted." (Internal quotation marks omitted.) *State* v. *Hernandez*, 28 Conn. App. 126, 138, 612 A.2d 88, cert. denied, 223 Conn. 920, 614 A.2d 828 (1992).

In evaluating the relevance of the evidence at issue, we are mindful that the defendant relied on evidence concerning gunshot residue on Long's clothing in support of the argument that Long was the lone shooter on the Stratford Avenue Bridge. During closing argument, the defendant argued that the evidence demonstrated that, in contrast to the clothing he wore at the time of the shooting, Long's clothing "had the type and the amount of residue that you would find if a person had discharged a firearm." The evidence related to the prior shooting tended to demonstrate that Long's clothing tested positive for gunshot residue not because he was the only shooter on the bridge, but because, in accordance with the state's version of the facts, he had discharged a .40 caliber Springfield Armory pistol at the scene of the prior shooting and, a very short time later, on the bridge.

Setting aside the issue of gunshot residue, the court also instructed the jury that the evidence concerning the earlier shooting was relevant to its consideration of when the Springfield Armory pistol had been deposited in the Pequonnock River. The value of the evidence in this regard is significant because it tended to support

a finding that, consistent with the state's version of the facts, the pistol had been deposited in the river just after the shooting on the bridge ended.

Moreover, previously in this opinion, we discussed the fact that during cross-examination, the defendant's attorney opened the door into an examination as to whether the police officers had approached the defendant and Long on the bridge with an appropriate degree of caution under the circumstances. See footnote 9 of this opinion. Before any details of a prior investigation or shooting were before the jury, the defendant's attorney engaged in this field of inquiry after indicating to the court that the defense did not intend to challenge the legality of the actions of the police in stopping the defendant. Under these circumstances, it was fair to permit the state to present the jury with evidence that reflected the context of the events giving rise to the police actions at issue.

Having identified that the evidence related to the prior shooting had probative value in light of certain issues raised by the defense, we readily reject the argument that the evidence was unduly prejudicial to the defense.[15] The prosecutor asked the defendant whether he was present, prior to the shooting on the bridge, when Long shot someone, to which the defendant replied that he did not know anything about a prior shooting. Although the state presented forensic evidence and testimony by the police related to the prior shooting, the state did not present any evidence that the defendant engaged in any wrongdoing in connection with the prior shooting. Moreover, the court delivered limiting instructions that guided the jury to a proper use of the evidence at issue. As we stated previously in this opinion, absent any indication to the contrary, we may presume that the jury followed such instructions. See *State* v. *Kantorowski*, supra, 144 Conn. App. 492.

### III

Next, we address the defendant's claim that the court improperly permitted the prosecutor to question him concerning a statement that he allegedly made prior to the time of the shooting on the bridge. We disagree.

The record reflects that during the state's cross-examination of the defendant, the following colloquy took place:

"Q. . . . [A]re you familiar with the expression, to roll up when somebody rolls up on you?

"A. Yes.

"Q. What does that mean?

"A. When, like, someone run up on you. . . .

"Q. Like, in a car?

"A. In walking, whatever it may be, whatever it may

be; walking, running.

"Q. All right. Could it apply to a car approaching you?

"A. Yes; it could.

"Q. All right. And are you familiar with the expression when you say, let's bounce or to bounce?

"A. Yes.

"Q. What's that mean?

"A. To . . . leave.

"Q. All right. *Do you recall telling an individual before this incident on September the 24th that if you're with me and the police roll up, bounce cause I'm shooting?*

"A. No; I never said nothing like that." (Emphasis added.)

After the defendant's testimony concluded, and outside of the presence of the jury, the defendant's attorney noted for the record that, at sidebar, he had raised an objection to the state's question concerning a prior statement by the defendant, emphasized previously. The defendant's attorney stated that he objected to the question on the grounds that it was beyond the scope of the defendant's direct examination, it was unduly prejudicial, and the defense lacked sufficient facts about the source of the information on which it was based. The defendant's attorney represented that the prosecutor had advised him of this topic prior to the commencement of evidence. Additionally, the defendant's attorney moved for a mistrial on the basis of the question posed by the prosecutor.

Discussing the factual basis of the question that he asked of the defendant, the prosecutor stated that Blackwell informed him that he had spoken with an individual who was familiar with the defendant and the allegations in this case. That person told Blackwell that he was not surprised when he learned of the allegations because the defendant had told him that "if you are with me and the police roll up, bounce because I'm shooting . . . ." The prosecutor stated that the individual who related these facts to Blackwell was someone "who he has worked with" and someone who had provided "reliable" information to Blackwell.

The court overruled the defendant's objection and denied his motion by stating: "[T]he question . . . is certainly designed to elicit . . . information that would be highly relevant and probative. The state had a good faith basis to ask the question. While there may not have been a police report that memorialized this conversation [between Blackwell and the third party] . . . counsel was advised of it prior to the start of the evidence. . . . I assume that until the defendant made the decision to testify, it's not a question that would have been asked. So, I think that . . . I did rule that the

objection would be overruled, and those are the reasons why.

"I think a mistrial is answered by the same comments. The motion for mistrial is denied. It creates no substantial or irreparable prejudice of any kind, and, again, the jury will be instructed that it's not the questions asked but the answers given to those questions that are, in fact, evidence. That's the ruling."

Several days later, the defendant's attorney renewed his motion for a mistrial and expressed his concern that the jury might conclude that, although the defendant denied making the statement at issue in the prosecutor's question, the opposite answer to the question is true. The defendant's attorney stated that if the jury were to draw such an improper inference from the question and the defendant's reply to it, it would deny the defendant a fair trial and infringe on his right to testify. The court denied the motion, stating in relevant part: "[T]he state did have a good faith basis to ask the question. The witness was asked the question, denied it and then the examination moved on. . . . I don't think that the simple asking of the question creates a specter of prejudice to the defendant under all the circumstances."

The defendant acknowledges that "the state had a good faith basis for asking the question." Nevertheless, he argues that the court erroneously permitted the prosecutor to ask him about his prior statement because the inquiry was not relevant and was unduly prejudicial to the defense.[16] As stated previously, both of these evidentiary claims were raised before the trial court.[17] Our deferential standard of review of evidentiary rulings is set forth in part II of this opinion. This evidentiary claim is premised on the well settled authority that, following a timely objection on these grounds, the court has a basic judicial duty to prohibit inquiry into subjects that are not relevant or that are unduly prejudicial to the defense. See Conn. Code Evid. §§ 4-2 and 4-3.

We agree with the court's assessment that the question posed by the prosecutor and the defendant's testimony in response to the question were highly relevant to the issues before the jury. The central factual issue before the jury was whether the defendant, when approached by the police, brandished a firearm and opened fire in the direction of the police. The question posed by the prosecutor sought to ascertain whether, prior to the shooting on the bridge, the defendant essentially had stated that if he was stopped by the police he would begin shooting. It belies logic to suggest, as does the defendant, that such an inquiry was "not probative of anything." If the defendant answered the prosecutor's inquiry in the affirmative, it certainly would render it more likely than it would be absent such testimony that the defendant acted in conformity with his prior statement when, on September 24, 2010, he was stopped by Granello and the other officers on the Strat-

ford Avenue Bridge. Another important factual issue before the jury concerned the defendant's intent. If the defendant answered affirmatively, the testimony would be compelling evidence that the defendant, in shooting at Granello, acted with the intent to cause serious physical injury; see General Statutes § 53a-59 (a) (1); or to cause death. See General Statutes § 53a-54a (a).

Because the inquiry was highly probative, the defendant faces a difficult task to demonstrate that the inquiry or the evidence that resulted from it was unduly prejudicial and that the undue prejudice outweighed the probative value of the evidence. To demonstrate reversible evidentiary error in this regard, it is insufficient for the defendant simply to demonstrate that the trial court admitted highly prejudicial evidence; the evidence must have been *unduly* prejudicial in light of the facts of the case, such that its admission was unfair to the defendant. See, e.g., *State* v. *Hernandez*, supra, 28 Conn. App. 138. The defendant argues that the prosecutor's question unfairly suggested that the defendant and Long were "chillingly violent urban criminals" and that it blunted the defense theory of the case with "the media image of urban gang-bangers." The prosecutor's inquiry consisted of a single question concerning a prior statement. There is no dispute that the prosecutor had a good faith basis to make the inquiry, and we already have determined that it was highly relevant to material issues in the case. Although the statement at issue certainly was unfavorable to the defense, the question did not suggest any prior wrongful conduct on the part of the defendant or that he made this statement to one or more persons who had engaged in wrongful conduct. The defendant's response to the inquiry consisted of a simple denial, and the prosecutor did not ask the defendant any additional questions related to this issue. The defendant's argument that the prosecutor's carefully tailored inquiry was unfair because it conjured up negative images of urban youth is unpersuasive because the prosecutor had a good faith basis for the inquiry, it was highly relevant to the issues before the jury, and it was limited to its most basic facts. Under these circumstances, we disagree that the brief inquiry was unduly prejudicial to the defense. Furthermore, the court carefully tailored its instructions to address concerns advanced by the defendant. The court instructed the jury that questions were not evidence and that, absent relevant evidence to the contrary, it was not permitted to infer that the opposite of a witness' testimony was true.[18] These instructions lessen the likelihood that the inquiry was unduly prejudicial to the defendant. For the foregoing reasons, we conclude that the defendant has not demonstrated that the court's admission of the evidence at issue constituted an abuse of discretion.

IV

Finally, the defendant claims that his conviction of attempt to commit assault in the first degree in violation of §§ 53a-59 (a) (1) and 53a-49 should be set aside because the court improperly instructed the jury with regard to the element of intent. We disagree.

We begin our review of the relevant facts by setting forth a relevant portion of the court's charge for the crime of attempted murder because the court referred to this earlier instruction when it instructed the jury concerning the crime at issue. In this earlier portion of its charge, the court stated, in relevant part: "For you to find the defendant guilty of the charge of attempt to commit murder, the state must prove the following elements beyond a reasonable doubt. The first element is that the defendant had the kind of mental state required for commission of . . . murder. The intent for that crime is the specific intent to cause the death of another person. Here, it's alleged that the defendant had the specific intent to cause the death of Sergeant Gregory Granello. Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. Specific intent is the intent to achieve a specific result. A person acts intentionally with respect to a result when his conscious objective is to cause such result. There's no specific length of time required for a defendant to have formed this specific intent. What the defendant intended is a question of fact for you to determine. Now, what a person's intention was is usually a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain knowledge or certain purpose or intention to do harm to another . . . [and] intent is generally proved by circumstantial evidence. The only way a jury can ordinarily determine what a person's intention was at any given time is by determining what the person's conduct was and what the circumstances were surrounding that conduct and from that infer what his intention was.

"The type of the instrumentality used, here, a firearm, in the circumstances of its use may be considered as evidence of the perpetrator's intent, and from such evidence an inference may be drawn that there was intent to cause a death. Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is an inference of fact to be drawn by you upon consideration of these and other circumstances in the case in accordance with my previous instructions. This inference is not a necessary one; that is, you are not required to infer intent from the defendant's alleged conduct or from the nature of any instrumentality used. But it is an inference you may draw if you find it is reasonable and logical, and in accordance with my instructions on circumstantial evidence.

"To draw such an inference is the proper function of a jury, provided, of course, that the inference drawn

complies with the standards for inferences as explained in connection with my instruction on circumstantial evidence. The inference is not a necessary one. You're not required to infer a particular intent from the defendant's conduct or statements, but it's an inference that you may draw if you find it's reasonable and logical. I again remind you that the burden of proving intent beyond a reasonable doubt is on the state."

In the context of its instruction for the crime of attempt to commit assault in the first degree, the court instructed the jury, in relevant part: "The first element is that the defendant had the kind of mental state required for the commission of the crime of assault in the first degree. The intent for that crime is the specific intent to cause serious physical injury to another person by means of a deadly weapon. A person acts intentionally with respect to . . . a result when his conscious objective is to cause such result. In count two, the state claims that the conscious objective of the defendant was to cause serious physical injury to Sergeant Gregory Granello by means of a deadly weapon, here, a handgun. Again, what the defendant's intention was is a question of fact for the jury. You should apply my previous instructions concerning evidence of intent and the drawing of inferences for purposes of determining the defendant's intention."

The defendant argues that the court's instruction was deficient because the court declined to deliver an instruction that he requested, specifically, that "the use of a weapon, such as a gun, does not in and of itself prove that a defendant specifically intended to cause the death of another person." The defendant argues that "while the presumption may be appropriate in cases involving an actual homicide or assault, it is pure speculation to draw such a conclusion in an attempted assault case, like this one."

The defendant submitted a written request to charge and, in the portion of the written request entitled "Attempted Murder," the defendant sought an instruction that stated, in relevant part: "[T]he type and manner of the instrument used may be considered as evidence of a defendant's intent, and from such evidence an inference may be drawn that there was intent to cause death. Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is an inference of fact to be drawn by you upon consideration of these and other circumstances in the case in accordance with my previous instructions. Please know, however, that the use of a weapon, such as a gun, does not in and of itself prove that a defendant specifically intended to cause the death of another person." The defendant did not file a written request to charge that covered the elements of the crime integral to this claim, attempt to commit assault in the first degree.

During the charging conference, the defendant's

attorney objected to the fact that the court had not included in its draft charge the language set forth previously concerning intent that he had suggested in his written request to charge. In this regard, the defendant's attorney explicitly referred to the instruction he had set forth in his request to charge covering the requisite intent for the crime of attempted murder. At one point during a lengthy discussion of the court's proposed murder charge, the defendant's attorney stated that it was important for the court to convey to the jury that it was not to infer from the fact that the defendant discharged a gun that there "necessarily had been an intent to kill or an intent to seriously injure." The court responded by stating that it would "give some language concerning what inferences they may draw but are not required to draw concerning the instrumentality, and the use of that instrumentality and the circumstances. But certainly, I'm not going to indicate to the jury that they're required to draw any inference from those circumstances. I agree with that proposition from the defense, so it will be balanced in that regard."

After the court delivered its charge, the defendant's attorney objected as follows: "[U]nder count one, Your Honor did give an instruction on specific intent and did talk to the jury about the . . . presence of an instrument in connection with finding or not finding specific intent, and I just want to point out to the court that although we don't quarrel with the fact that the court can instruct the jury with regard to the presence . . . of an instrument, in other words, a weapon and sizing up whether specific intent is established, we did request at page 57 of our proposed charge in March the following sentence; please know, however, that the use of a weapon such as a gun does not in and of itself prove that a defendant specifically intended to cause the death of another person. . . . I did want to bring that to Your Honor's attention because we feel that a sentence like that tends to balance the instruction."

The parties are in disagreement as to whether the defendant's claim of instructional error was properly preserved before the trial court. "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. . . ." Practice Book § 42-16. "The purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." (Internal quotation marks omitted.) *State* v. *Miller*, 186 Conn. 654, 658, 443 A.2d 906 (1982).

Arguing that the claim is not preserved, the state

correctly observes that the instruction at issue was included only in a request to charge for the crime of attempted murder. The defendant argues that his written request to charge adequately preserved the claim. Additionally, he argues that, during the charge conference, he argued that the requested instruction was warranted to convey to the jury that it was not to infer from the fact that the defendant discharged a gun that there "necessarily had been an intent to kill *or an intent to seriously injure*." (Emphasis added.) The defendant argues that his reference to an intent to seriously injure plainly conveyed that his argument and request to charge applied not only to the instruction covering attempted murder, but to the instruction covering attempt to commit assault in the first degree. Alternatively, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

We agree with the state that the defendant's request to charge did not adequately preserve this issue for our review because it was a request to charge covering the specific intent for the crime of attempted murder. Also, the defendant's exception to the charge appears to have been related to the instruction for the crime of attempted murder; it did not encompass the charge for attempt to commit assault in the first degree. During a lengthy charging conference, the defendant's attorney made an isolated remark concerning the specific intent to cause serious physical injury. Yet, in light of the fact that the argument was based on the written request to charge, which covered the crime of attempted murder, it is unreasonable to conclude that this isolated reference to the intent to cause serious physical injury distinctly raised any issue related to the assault charge. The isolated statement, during a lengthy colloquy unrelated to the assault charge, cannot be said to have alerted the court to the fact that the argument concerning a proper intent instruction also was meant by the defense to apply to the instruction for attempt to commit assault in the first degree.

Although we conclude that the claim was not adequately preserved, we conclude that it is reviewable under *Golding*. "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) Id.

The record is adequate to review the claim of instructional error, and a claim of instructional error related to

the essential elements of an offense is of constitutional magnitude. "It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . A claim that the trial court failed to instruct the jury adequately on an essential element of the crime charged necessarily involves the defendant's due process rights and implicates the fairness of his trial." (Internal quotation marks omitted.) *State* v. *Felder*, 95 Conn. App. 248, 258, 897 A.2d 614, cert. denied, 279 Conn. 905, 901 A.2d 1226 (2006).

Having concluded that the claim is reviewable under *Golding*, we turn to an evaluation of its merits. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360–61, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). "While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 455.

The gist of the defendant's claim is that it is reasonably possible that the court's instruction conveyed a *mandatory* presumption that the defendant's use of a deadly weapon was proof of his intent to kill, thus diluting the state's burden of proof on the essential element of intent. As the defendant correctly observes, however, the jury properly may be instructed that it may draw an inference concerning a defendant's intent from his use of a deadly weapon. "In *Sandstrom* v. *Montana*, [442 U.S. 510, 517–24, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)], the United States Supreme Court held

that a jury instruction that the law presumes that a person intends the ordinary consequences of his voluntary acts violated the defendant's due process rights because a reasonable jury could have interpreted the instruction as a conclusive or burden-shifting presumption and thus relieved the state of its burden of proving every element of the crime. . . . We have, however, recognized that the rule of *Sandstrom* must not be oversimplified. . . . *Sandstrom* does not invalidate, for example, the use of an entirely permissive inference or presumption, which allows . . . the elemental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant. . . . A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 545–46, 679 A.2d 902 (1996).

Our careful review of the court's instructions, viewed as a whole, leads us to conclude that they properly conveyed to the jury that it would be proper to view the defendant's use of a firearm as evidence of his intent, but that the jury was by no means required to draw such an inference. As set forth in greater detail previously in this opinion, in the context of its instruction for attempted murder, the court stated: "The type of the instrumentality used, here, a firearm, in the circumstances of its use *may* be considered as evidence of the perpetrator's intent, and from such evidence an inference *may* be drawn that there was an intent to cause death." (Emphasis added.) The court's repeated use of the word "may" conveyed that the inference was merely a permissive one. See, e.g., *State* v. *Smith*, 275 Conn. 205, 238–39, 881 A.2d 160 (2005) (inclusion of permissive language such as word "may" ensures that jury will not interpret charge in unconstitutional manner). The court, however, was even more explicit in this regard by stating: "*This inference is not a necessary one*; that is, you are not required to infer intent from the defendant's alleged conduct or from the nature of any instrumentality used. But it is an inference you *may* draw if you find it is reasonable and logical . . . ." (Emphasis added.)

As set forth in greater detail previously in this opinion, in the context of its instruction for attempt to commit assault in the first degree, the court stated that the state bore the burden of demonstrating the requisite mental state for the commission of the crime, specifically, that the defendant intended to cause serious physical injury to Granello by means of a handgun. The court instructed the jury to refer to and to apply to its consideration of this offense the instructions concerning evidence of intent that it previously had delivered in the context of its attempted murder instruction. Thus, the court's instruction concerning intent included an

unambiguous reference to its previous instruction that invited the jury to draw a permissive inference related to the defendant's intent if it chose to do so. Moreover, the court repeatedly emphasized during its charge that the state bore the burden of proving intent beyond a reasonable doubt.[19]

Our interpretation of the court's charge is supported by this court's precedent. In *State* v. *LaSalle*, 95 Conn. App. 263, 897 A.2d 101, cert. denied, 279 Conn. 908, 901 A.2d 1227 (2006), this court rejected a claim of instructional error that is similar to the one before us presently. The defendant in *LaSalle* claimed that the trial court improperly declined to instruct the jury, as he had requested in a written request to charge, "that the use of a deadly weapon, by itself, does not prove an intent to cause the death of the victim and to commit the crime of murder." Id., 274. The defendant claimed that the court's charge could be interpreted to state that the use of a deadly weapon constituted proof of his intent to kill the victim, and that it thereby improperly shifted the state's burden of proof with regard to the element of intent. Id., 273–74. After reviewing the charge, this court concluded that the trial court properly had conveyed to the jury, by means of its repeated use of the word "may," its statement that "[t]his inference is not a necessary one"; id., 275; and its instructions concerning the state's burden of proof concerning intent, that it was *permissible* for the jury to draw such an inference, but that it was not *mandatory*. Id., 277. Accordingly, this court rejected the defendant's claim that the court's failure to deliver the instruction that he requested possibly misled the jury. Id.

The defendant attempts to distinguish *LaSalle* from the present case on the ground that the defendant in *LaSalle* was convicted of an offense, murder, that resulted in the death of a victim.[20] Id., 265. He argues that because the present case involves an attempt crime that did not result in death, the jury was unable to make a similar connection between the *use* of an instrumentality and the *consequences* of such use. Under this rationale, the defendant argues that "the firing [of a gun] could be a warning shot or even an accident. Without the connection (the use [of a gun] *and* the resultant death), the only way to infer intent is to speculate." (Emphasis in original.)

The defendant's argument does not take into account the specific language used by the court in the present case. The court did not invite the jury to draw an inference merely from the fact that the defendant possessed a handgun. Rather, the court stated in relevant part that "[t]he type of the instrumentality used, here, a firearm, in *the circumstances of its use* may be considered as evidence of the perpetrator's intent . . . . Any inference that may be drawn from the nature of the instrumentality used and *the manner of its use* is an inference

of fact to be drawn by you upon consideration of these *and other circumstances in the case* . . . ." (Emphasis added.) The court did not invite speculation with regard to the inference at issue by referring to a particular result, but it carefully instructed the jury that the firearm and the circumstances and manner of its use may be considered as evidence of intent.

We disagree with the defendant's argument that it is improper for a jury to consider this type of evidence as evidence of a perpetrator's intent in an attempt crime. In the context of this claim, the defendant suggests that intent may be inferred, if at all, solely from a violent result, such as death. Thus, he suggests that it is impermissible to draw inferences from the type of an instrumentality used unless it results in such a violent outcome. Our law reflects that an inference in this regard is not necessarily dependent on lethal consequences, but on the type of instrumentality and the circumstantial evidence concerning the manner of its use. See, e.g., *State* v. *Gary*, 273 Conn. 393, 410, 869 A.2d 1236 (2005) (proper for jury to consider both use of gun and circumstances surrounding shooting to determine whether defendant discharged gun with intent to kill). The court's instructions in the present case properly invited the jury to draw reasonable inferences concerning the defendant's intent from the circumstantial evidence concerning his use of a firearm. Thus, there is no danger that, if the jury found that the defendant used the firearm merely to discharge warning shots or that he discharged it accidentally, it would have inferred from this type of use that he had intended to kill or to cause serious physical injury. In light of the evidence of the circumstances surrounding the shooting, it was reasonable and logical for the jury to conclude that the defendant was attempting, intentionally, to cause serious physical injury to Granello by firing a gun at him.

In light of the foregoing, we conclude that it is not reasonably possible that the court's instruction misled the jury as to the state's burden of proof with regard to the element of intent. Accordingly, the defendant has not demonstrated that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial. The claim fails under *Golding*'s third prong.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury found the defendant not guilty of attempt to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-49. The court imposed a total effective sentence of twenty-six years incarceration, with a six year mandatory minimum sentence.

[2] On September 24, 2010, the defendant was eighteen years of age, and he did not possess a permit to carry a handgun.

[3] The requested instruction states: "One of the most important issues in this case is the identification of the defendant, Robert D. Bullock, as the person who committed the crime charged in the information.

"During the trial there was testimony from one or more persons who claim to have seen some of the events in question. Such witnesses may

fairly be referred to as eyewitnesses.

"When a witness makes an identification, the witness is expressing an opinion that may be accurate or inaccurate. Eyewitnesses can be sincere, but mistaken. Eyewitness mistakes have long been, and continue to be, the leading cause of wrongful convictions. Even where a witness believes that his or her testimony is accurate, it is your function to determine whether the witness' identification of the accused is reliable, or whether it is based on a mistake or for any reason is not worthy of belief.

"In assessing the testimony of an eyewitness you should remember that the eye is not like a camera and memory is not like a videotape or DVD. Witnesses can be honestly mistaken about what they see and what they honestly believe they remember about an incident. You should consider the possibility of a good faith mistake in your consideration of the testimony.

"When you consider the witness' ability to observe facts correctly and to relate them truly and accurately, you should consider at least the following questions:

"1. What was the witness' physical, mental and emotional capacity to observe and remember events?

"You should consider factors unique to each witness, including the witness' physical condition, including the need for corrective eyeglasses, the witness' use of alcohol, medication or illicit drugs, the witness' mental condition, including fatigue, and the witness' emotional condition, including stress caused by the incident.

"Both inattention and highly stressful situations can cause witnesses to not accurately perceive or recall events. High degrees of stress can also cause witnesses to overly focus on one object or event (tunnel vision) to the exclusion of the total incident. Stress effects the entire memory. You cannot divide the witness' memory into observations made shortly before a stressful event, and those made during and after the event.

"2. Did the witness have an adequate opportunity to observe the events in question?

"Whether each witness had an adequate opportunity to observe the events in question will be affected by many things, including the length of the incident and their observation of it, the distance between the witness and the objects observed, the lighting conditions or effects of glare, whether the view was obstructed or unobstructed, and whether a weapon was present.

"If you conclude that a weapon was visible, you should consider that its presence can distract a witness and draw his or her attention away from the culprit's features. 'Weapon focus' can thus impair a witness' ability to make a reliable identification and describe what the culprit looks like, particularly if the crime is of short duration.

"You should consider the extent to which the witness' recollection about distance and obstructions has been corroborated or contradicted by forensic evidence. You should also consider whether the witness may be honestly mistaken about the duration of his or her observation of the incident and the quality of his or her opportunity to view it.

"3. Has the witness demonstrated an adequate ability to recall and narrate his or her observations of the events in question?

"You should consider when each witness' statement was first recorded, bearing in mind that 'memories fade over time, that people under severe stress do not acquire information as well as alert people not under stress, and that people tend unconsciously to resolve apparent inconsistencies between their memories and after-acquired facts' gained from speaking with other witnesses, from reading or listening to the media, and by efforts to put memories into a logical narrative. To the extent that the witness has discussed the incident with others, you should consider whether the witness may have subconsciously conformed his or her memory to his or her peers' recollections or to investigators' theories.

"You should consider how much emphasis to place on the witness' recollection of peripheral details, as this has been shown to lack correlation to accurate memories of central facts.

"Although nothing may appear more convincing than a witness' categorical identification of a perpetrator, you must critically analyze such testimony. Such identification, even if made in good faith, may be mistaken. An eyewitness' confidence in his or her identification, recorded after a properly performed identification procedure and before the witness is given any feedback about whether he or she picked the police suspect, is a weak predictor of the accuracy of his or her identification. Studies have shown that a witness' confidence may be inflated during the period between the identification procedure and trial, so that the witness' present confidence may not reflect

the witness' confidence at the time of the procedure and has little relationship to the accuracy of his or her identification.

"4. Is there any indication that the witness' observations of the events in question have not remained consistent over time or that they are in whole or in part the product of after-acquired information?

"If the witness has made an in-court identification of the defendant, you must consider whether the in-court identification is based on the witness' having seen the defendant at the out-of-court identification procedure, rather than the result of the witness' observations or perceptions of the perpetrator during the commission of the offense. You should bear in mind that in-court identifications are generally less reliable than other identifications because they occur furthest in time from the incident, the witness has most likely already seen the defendant in an earlier procedure, and they are inherently suggestive, as the person in the courtroom suspected of having committed the offense is usually self-evident to even the casual observer. The ultimate issues of the accuracy of both the in-court and out-of-court identifications are for you to decide.

"Additionally, you should consider the general credibility of the eyewitness in the same manner as you would any other trial witness.

"With these considerations in mind, you should give the testimony of an eyewitness the weight, if any, you believe it deserves. The credit or weight you will give such testimony is something which you alone must determine." (Footnotes omitted.)

[4] The court instructed the jury in relevant part: "In weighing the credibility of the witnesses, you should consider the probability or improbability of their testimony. You should consider their appearance, conduct and demeanor while testifying and in court, and any interest, bias, prejudice or sympathy which a witness may apparently have for or against the state, or the accused or in the outcome of the trial. With each witness you should consider his ability to observe facts correctly, recall them and relate them to you truly and accurately. You should consider whether and to what extent witnesses needed their memories refreshed while testifying. You should, in short, size up the witnesses and make your own judgment as to their credibility and decide what portion—all, some or none—of any particular witness' testimony you will believe based on these principles. You should harmonize the evidence as far as it can reasonably be done. You should use all your experience, your knowledge of human nature and of the motives that influence and control human conduct, and you should test the evidence against that knowledge. You should bring to bear upon the testimony of the witnesses the same considerations and use the same sound judgment you apply to questions of truth and veracity as they present themselves to you in everyday life.

"You are entitled to accept any testimony which you believe to be true and to reject either wholly or in part the testimony of any witness you believe has testified untruthfully or erroneously. The credit that you will give to the testimony offered is, as I have told you, something alone which you must determine. If you find that a witness has intentionally testified falsely, you should keep that in mind and scrutinize the whole testimony of the witness. You may disregard the witness' entire testimony, but you are not required to do so. It remains up to you to accept or reject all or any part of the testimony. If you find that a witness has been inaccurate in some way and you do not think that the inaccuracy was consciously dishonest, you can consider the inaccuracy in evaluating the rest of his testimony. You know that persons sometimes forget things, or they get something wrong. The significance you attach to a misstatement may vary more or less with the particular fact as to which the inaccuracy existed or with the surrounding circumstances. Give to it that weight which your own mind leads you to think it ought to have, in which you would attach to it in the ordinary affairs of life where someone came to you in a matter and you found that in some particular, he was inaccurate."

[5] In relevant part, the court stated: "The state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crime. The defendant denies that he is the person who was involved in the commission of the alleged offenses. In this case, the state has presented evidence that eyewitnesses identified the defendant in connection with the crime charged. Identification is a question of fact for you to decide, taking into consideration all the evidence that you have seen and heard in the course of the trial. The identification of the defendant by a single witness as the one involved in the commission of a crime is in [and] of itself sufficient to justify a conviction of such a person, provided, of course, that you are

satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime.

"In arriving at a determination as to the matter of identification, you should consider all the facts and circumstances that existed at the time of the observation of the perpetrator by each witness. In this regard, the reliability of each witness is of paramount importance. Since identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity and ability of the witness to observe the perpetrator at the time of the event and to make an accurate identification later. It is for you to decide how much weight to place upon such testimony . . . ."

[6] Likewise, our Supreme Court has stated that an evidentiary ruling related to expert testimony on eyewitness identification does not give rise to a claim of constitutional magnitude. *State* v. *Guilbert*, 306 Conn. 218, 265, 49 A.3d 705 (2012); id., 265 n.45 (noting that "there is no basis for such a claim").

[7] We note that on October 30, 2014, the defendant, presumably pursuant to Practice Book § 67-10, submitted a letter to the clerk of this court notifying the court that "a new report from the National Research Council was released on October 2, 2013 . . . ." The letter provided an Internet website address that brings the reader to a 120 page document with the title "Identifying the Culprit: Assessing Eyewitness Identification." The document, published by the "National Academies Press" is marked with the heading "Prepublication Copy-Unedited Proofs."

The defendant's reliance on this material suffers from several infirmities. As a preliminary matter, although portions of the material address inaccurate results of identification procedures used by the police, the material does not appear to help the claim presently before us because it appears to bolster the state's argument that the defendant's arrest in the present case did not result from any type of identification procedure. For instance, the document states in relevant part: "Police in the United States investigate millions of crimes each year. Only a small percentage of police-investigated crimes involve the use of police-arranged identification procedures. Identification procedures are unnecessary when, for example, *the perpetrator is caught during the commission of the criminal act*, as in the crime of driving while intoxicated, or when the victim knows the perpetrator, as in crimes of domestic violence." (Emphasis added; footnote omitted.)

More importantly, the defendant's reliance on this material is inappropriate because it was not available to, or considered by, the trial court, it is not legal authority, and it appears to have been submitted for the purpose of discrediting the jury's assessment of the eyewitness testimony in the present case. "Even if we were to consider the material not in terms of adjudicative facts, but in terms of legislative facts that may be relevant to arguments regarding the content of law and policy, we, as a reviewing court, are in a poor vantage point from which to evaluate the authoritativeness and reliability of the facts contained in this material." See *State* v. *Edwards*, 314 Conn. 465, 481,    A.3d    (2014).

[8] The court stated that competent expert testimony related to the following propositions satisfied the threshold admissibility requirement of *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998): "(1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." *State* v. *Guilbert*, supra, 306 Conn. 253–54.

[9] See footnote 12 of this opinion.

[10] The record reflects that, during his cross-examination of Granello, the defendant's attorney inquired as to the precise manner that he approached the defendant and Long on the bridge. By focusing on whether Granello had his service weapon drawn at this time, this line of questioning appeared to be focused on the degree of danger that Granello perceived when he first

issued his commands to both individuals. The following colloquy occurred:

"Q. And you say that you directed each of these two people to show their hands?

"A. Yes.

"Q. But at this moment in time you did not have your gun drawn?

"A. No. . . .

"Q. But at the time that you gave the command for them to show their hands . . . you yourself did not have your service weapon drawn?

"A. No.

"Q. And as you sit here today, you're not even clear on whether you had your hand on the weapon or the strap unbuttoned?

"A. I'm unsure. . . .

"Q. Okay. Generally speaking, wouldn't you have your gun out and trained on somebody if you were commanding them to show their hands?

"A. Depending on who they are . . . what the situation is and based on that situation . . .

"Q. But you didn't nevertheless have your gun out?

"A. Not out; no.

"Q. Well . . . if you can't remember whether you had your hand on your hip and hand the . . . safety strap unbuttoned, what else would there be?

"A. Well, I was approaching . . . I didn't just run across the car."

During his cross-examination of Ferri, the defendant's attorney asked him if and when he unholstered his service weapon. When Ferri stated that he unholstered his weapon only when Granello came under fire, the defendant's attorney asked: "And given everything that you had thought and experienced up to that point in time, you didn't think it would be prudent to . . . have it out?"

[11] See footnote 12 of this opinion.

[12] As discussed previously in this opinion, at trial, the defendant sought to preclude any evidence that he was present at the prior shooting. Later, however, the court ruled that the state could present evidence that the defendant was present at the prior shooting, but that he was not "shooting or armed" at that time. With regard to the evidence presented concerning the prior shooting, there was no evidence that the defendant was present at the shooting scene with Long, let alone that he had engaged in any type of criminal behavior in connection with that incident. During an offer of proof, outside of the presence of the jury, the defendant's attorney elicited testimony from Villafane that the victim of the prior shooting had identified Long as the shooter and had stated that Long was accompanied by a male who was wearing a red shirt. The admissibility of this testimony was contested at trial, and the defendant's attorney decided not to pursue its admission.

[13] The court stated: "Ladies and gentlemen, I'm going to cover this in my final instructions as well, but I'm going to give you a certain instruction concerning . . . the evidence you just heard . . . because to put this in context, there has been testimony from, I believe, Marshall Robinson, that these casings now introduced into evidence . . . had been fired from a weapon recovered from the Pequonnock River . . . .

"In any event, the evidence in that regard, then, including the evidence today, is admitted for a limited purpose . . . that you may consider this for . . . relates to your consideration of when the weapon may have been first deposited in the Pequonnock River. It also relates to your consideration of the testimony of gunshot residue on the clothing of Daquan Long, and the time or origin of that gunshot residue, and any other reasonable inferences you may choose to make from that evidence. Of course, the credibility of all this evidence and the weight you give it is for you to decide, and any inferences you choose to draw must be reasonable.

"That said, you may not consider this evidence as any evidence that this defendant, Mr. Bullock, was involved in any prior shooting at Wood and Iranistan, and you may not consider it as any evidence of the character of the defendant or any . . . propensity of the defendant, or anything of that nature at all. It's admitted—it would be wrong for you to do that, and you must not do that. It's admitted for the reasons I've indicated, but only those reasons . . . ."

[14] The court stated: "Now, you will remember during the trial that I said some testimony and evidence have been allowed for a limited purpose. Now, this included evidence that prior to events on the bridge there was a shooting in the vicinity of Wood and Iranistan Avenues, and shell casings recovered from the scene of that shooting came from a gun identified as a Springfield Armory .40 caliber Smith and Wesson, which was later recovered

from the river by the Stratford Avenue Bridge. Now, this evidence was admitted for your consideration of the source or origin of gunshot residue and component particles, which were testified as having been found on the clothing of Daquan Long, and for your consideration of the length of time the gun may have been in the river. Also, you may draw any reasonable and logical inferences from such evidence in accordance with any previous instructions. Of course, the credibility of this evidence and the weight you give it are for you to decide. However, there is an important cautionary note regarding this particular evidence and any other evidence in this matter which . . . relates to any expression of any level of concern by police officers who were involved in the investigation in the aftermath of that shooting, about the possible danger posed by the suspect. You can consider that evidence in a context of the actions taken by the police, but you may not use this evidence to infer or conclude that the defendant himself was somehow involved in any prior shooting or that he is a person of bad character or propensities. Any testimony or evidence which I identify as being limited to a certain purpose you will consider only as it relates to the limits for which it was allowed. And you shall not consider such testimony and evidence in finding any other facts as to any other issue. Any other use of such testimony and evidence would be improper."

[15] In his analysis of this claim, the defendant also suggests that evidence related to the prior shooting was unduly prejudicial because "it associated him speculatively with an earlier violent offense" and portrayed him "as a young, violent gang member." The defendant argues: "The misconduct evidence transformed the encounter on the bridge from a stop of two young men under suspicion to a stop of two young and violent urban criminals. Inevitably, the defendant's contention that he was an innocent companion to Long misidentified in the stress and confusion of the encounter as a fellow shooter was blunted by the media image of urban gang-bangers."

During the state's cross-examination of the defendant, the prosecutor asked the defendant about his activities with Long on the day of the shooting, as well as his relationship with Long generally. After the prosecutor asked the defendant whether he and Long were members of the same social organization, the defendant replied, "No." When the prosecutor asked if there was any significance to the clothing he and Long were wearing on the day of the shooting, the defendant's attorney, outside of the presence of the jury, objected on the ground that the line of questioning came close to suggesting that the defendant and Long were members of a gang. The court sustained the objection to any reference of gang activity. There was no evidence of gang activity in this case.

The record reflects that the questions to which the defendant objected were not necessarily related to the topic of the prior shooting, but concerned the nature of the relationship between the defendant and Long generally. In light of the undisputed evidence that the defendant was with Long at the time of the shooting on the bridge and, in fact, the evidence suggested that they may have acted in unison, such questions were relevant to issues before the jury. To the extent that the defendant suggests that *any evidence related to the prior shooting* should have been excluded because it suggested gang activity, we deem such a claim to be unpreserved because he did not object to the evidence on this ground at the time of trial. In the context of this argument, we reject the defendant's cursory invocation of the plain error doctrine. To the extent that the defendant suggests that any inquiry into the nature of the relationship between himself and Long was unduly prejudicial because it suggested gang activity, we conclude that such claim is without merit. The prosecutor's questions related to the relationship between the defendant and Long did not explicitly refer to membership in a gang, and the questions did not elicit any evidence of gang activity. Furthermore, before the jury, the prosecutor did not make any arguments that could be deemed as having raised the specter of gang activity.

[16] In his analysis of this claim, the defendant appears to refer to the evidence at issue as "prior misconduct evidence," and he invites us to review the evidentiary claim as one involving prior misconduct evidence. In the discussions regarding this evidence at trial, the prosecutor did not argue that any evidence in this regard was being offered as prior misconduct, the court did not admit it as such, and the defendant did not object to it on such ground. We are perplexed by the defendant's characterization that this claim involves prior misconduct because the evidence that the state yielded by the question and answer at issue was simply that the alleged statement had not been made. The court properly instructed the jury that the questions posed by the attorneys were not evidence, and the defendant plainly denied

having made the statement at issue.

[17] As our recitation of relevant procedural history reflects, the defendant moved for a mistrial on the basis of the prosecutor's question at trial. In this appeal, the defendant does not distinctly claim that the court's denial of that motion was in error.

[18] In its charge, the court instructed the jury regarding the manner in which it was to find facts, stating in relevant part as follows: "Now, in reaching your verdict, you should consider all the testimony, exhibits, and stipulations received into evidence, but certain things are not evidence and you may not consider them in deciding what the facts are. These include arguments and statements by counsel. . . . Questions and objections by counsel are not evidence."

When instructing the jury with regard to the manner in which it was to assess the credibility of witnesses, the court stated in relevant part: "You do not have to accept a fact as true because a witness has testified to it and no one contradicts it. The credibility of the witness and the truth of the fact are for you to determine. A corollary to this is that if you disbelieve something a witness said, you can't conclude that the opposite must be true unless other evidence or reasonable inferences from proven facts establishes that to be the case. This is simply consistent with the principle that you cannot go outside the evidence to find the facts."

[19] By way of example, the court stated: "The burden to prove the defendant guilty of the crimes in which he is charged is upon the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crimes charged." Later, during its instruction concerning attempt to commit assault in the first degree, the court stated: "[T]he state must prove both intent and conduct beyond a reasonable doubt to obtain a conviction." Also, the court stated: "[I]f you unanimously find that the state has failed to prove beyond a reasonable doubt either of these elements, you shall then find the defendant not guilty of the crime of attempt to commit assault in the first degree."

[20] The defendant also states that we should "revisit" *LaSalle*, presumably because he disagrees with the logic therein. Concluding that *LaSalle* is sound, we disagree with this aspect of the claim.

_____